RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

        *v.*                                      No. 09-1386

ROBERT C. DANIELS,
                    *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-20213-001—Lawrence P. Zatkoff, District Judge.

Argued: May 31, 2011

Decided and Filed: July 7, 2011

Before: BOGGS and KETHLEDGE, Circuit Judges; and COLLIER, Chief District
Judge.[*]

_____

## COUNSEL

**ARGUED:** Erik W. Scharf, Coconut Creek, Florida, for Appellant. Andrew Goetz,
ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** Erik W. Scharf, Coconut Creek, Florida, for Appellant. Leonid Feller,
ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. Robert Daniels, also known as "Motor City Mink," ran

a prostitution business in Detroit. Most of the prostitutes were adults, but a few teenage

_____

[*] The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of
Tennessee, sitting by designation.

1

girls were involved.  Daniels appeals his conviction on five counts of (I) engaging in a child exploitation enterprise ("CEE"), in violation of 18 U.S.C. § 2252A(g)(2), (II) manufacturing and (III) distributing child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252A(a)(2), (IV) transporting a minor for purposes of prostitution, in violation of 18 U.S.C. § 2423(a), and (V) sex trafficking of children, in violation of 18 U.S.C. § 1591(a).  He was sentenced to multiple concurrent terms, the longest of which was 420 months.  Daniels contends that the government presented insufficient evidence to sustain a conviction on Counts I, II, III, and V, that the district court committed plain error by instructing the jury that lack of knowledge of age was not a defense to Count IV, and that the evidence admitted in support of Count I had a prejudicial "spillover effect" that entitles him to a new trial on the other counts.  We affirm Daniels's conviction on Counts II–V but reverse as to Count I, because the government presented insufficient evidence—as we interpret the elements of § 2252A(g)(2)—to establish that Daniels was engaged in a CEE.

I

On April 16, 2008, Daniels and his co-defendant Stephanie Head were indicted by a grand jury on eight counts of child pornography and child and adult prostitution. The counts at issue in this appeal are:

I.    Engaging in a CEE, in violation of 18 U.S.C. § 2252A(g)(2), which provides:

A person engages in a child exploitation enterprise for the purposes of this section if the person violates section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim), as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons.

II.   Manufacturing child pornography, in violation of 18 U.S.C. § 2251(a), which punishes:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . .

III.    Distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), which punishes the knowing distribution of "any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer."

IV.    Transporting a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), which provides:

A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce . . . , with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

V.    Sex trafficking of children, in violation of 18 U.S.C. § 1591(a),[1] which punishes one who:

knowingly [] in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, or obtains by any means a person . . . knowing that . . . the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]

Head, Daniels's lead prostitute, or "bottom," pled guilty on July 10, 2008, agreeing to testify against Daniels, and was sentenced to ten years of imprisonment. Daniels's case proceeded to a jury trial, during which the government presented testimony from FBI agents, police officers, and Head and six other former prostitutes who had worked for Daniels.

Testimony established that the FBI connected Daniels's email address and phone number to internet advertisements of escort services on craigslist.org and other Internet sites. Approximately 2800 ads were posted, involving an estimated 89 individual prostitutes. The ads typically included a woman's photo and Head's phone number, used to make appointments. As a "bottom," Head's duties included taking money, scheduling "dates," and recruiting, training, and mentoring prostitutes. She also took photos of the prostitutes, and both she and Daniels posted Internet ads for escorts. Head testified that, when she posted ads, "usually [Daniels] told [her] to do it." She stated that Daniels

---

[1]In 2008, the statute was amended to change "knowing" to "knowing, or in reckless disregard of the fact." 18 U.S.C. § 1591(a) (2008). The language provided here was in effect at the time of the conduct in question.

"disciplined" her, hitting and slapping her, when she "did something that [she] knew [she] wasn't supposed to do."

Besides the prostitutes themselves, several people assisted Daniels's operation. Head testified that Daniels met with pimps from Detroit and Ohio, who accompanied Head and Daniels on trips to other states. Daniels's brother rented hotel rooms that were used for prostitution, while his mother occasionally provided rides to Head and some of the other prostitutes.

Head testified about Daniels's involvement with several minors. She stated that she and Daniels met SD in Maryland in late 2006 and took her to Detroit to engage in prostitution. Head stated that when Daniels met sisters RaH, ReH, and HH and their friend KC, he believed that the four girls "were 17 [and] about to be 18 in a week or so." Head testified that she took nude pictures of HH, and that Daniels told her to do so. She also identified notebooks she and Daniels used to keep track of the prostitutes' names, ages, and other information.

Another adult prostitute, Brittany Ayers, testified that she worked for Daniels from July 2007 to March 2008. She testified that she did not know, until she was arrested by police while on a "date" with KC, that any of the prostitutes were underage.

RaH testified that in September 2007, when she was 16 years old, she was walking home from a tattoo parlor with KC when "Mink" approached her in a Cadillac and asked her if she wanted a job. She told her sisters, HH and ReH, about the opportunity. Daniels took the four girls to a hotel and explained that they would put their pictures online and have sex for money. He took RaH into a bathroom and asked her to take off her clothes. RaH testified that she went on three "dates," and that she first told Daniels she was 18, then "at some point" told him that she was 17. She testified that she was "pretty sure" one or more of the dates took place after she told him that she was underage.

ReH testified that she was 15 when she met Daniels in September 2007. She had sex for money twice and gave the money to Head. She testified that she told Daniels she was 18, but that she thought she told Head her true age.

HH testified that she was 16 in September 2007, when "Mink" picked her up and took her to a motel, where he explained that an escort service involved "[h]aving sex for money." She was asked to perform oral sex on Daniels in the motel bathroom. Head took nude pictures of her for craigslist ads. According to HH, she went on one "date." She testified that "at some point" she told Daniels that she was 17, and that he wrote that information down in a notebook.

SD testified that she was 16 years old in November 2006, when she met "Mink" in College Park, Maryland. She was walking down the street when he pulled up to her in a car and invited her to a hotel. At the hotel, she talked to Head and a prostitute named "Trouble" about "what they d[id] and where they [we]re from." She then accompanied Daniels, Head, and Trouble to a sex shop and a mall, where they purchased an outfit, makeup, and a wig for her. Daniels took pictures of SD and asked her to come to Detroit with them. The four drove to Detroit, where SD had at least three "dates." SD testified that nobody asked her how old she was until she arrived in Detroit. After SD had worked for Daniels, Head discovered that she was underage. The next day, Daniels gave SD $80 and took her to the Greyhound station to catch a bus back to Maryland.

The government played a series of phone calls that had been intercepted using a wire tap on Head's phone. During one call, Head told a fellow prostitute about an argument with Daniels:

> He said something stupid which pissed me off which made me say something stupid like, nigger, all you pimping now is little kids, you know, cause later all he had is like 14 through 16. So, I am like, you haven't had a girl that is 18 in a long time . . . .

The call was admitted over the hearsay objection of Daniels's attorney.  The government argued that it fell within a hearsay exception for statements made in the course of a conspiracy, and was also a statement against interest.

An FBI agent authenticated evidence seized from Daniels's home, including notebooks of information about prostitutes, fur coats, a chalice with the word "PIMP" on it in fake diamonds, a business card for "Motor City Mink" listing Daniels as CEO and owner, a casino player's card, a lease for a Cadillac in the name of Daniels's mother, bank cards, watches, and jewelry.

The parties stipulated that craigslist.org and other social-networking sites are Internet websites and that any image uploaded to them travels in interstate commerce. Jointly-submitted jury instructions provided the wording of the relevant statutes.  The instructions explained that Count I, the CEE charge, required the government to prove "three or more separate incidents in violation of" §§ 1591, 2251(a), 2252A(a)(2), or 2423(a), and that Counts II–V qualified as predicate violations for Count I.  With respect to Count IV, transporting a minor for purposes of prostitution, the district court instructed the jury that "[t]he law places the risk of . . . mistake or ignorance on the defendant."   The jury convicted Daniels on all eight counts.  On appeal, Daniels challenges his conviction on Counts I–V but does not contest the adult-prostitution counts.  Because Count I requires three predicate violations, we first consider Counts II–V.

II

A.  Manufacturing Child Pornography (Count II)

Daniels contends that the government presented insufficient evidence to convict him of manufacturing child pornography, in violation of § 2251(a).  In reviewing the sufficiency of the evidence to sustain a conviction, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A defendant challenging the sufficiency of the

evidence bears a very heavy burden." *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (citation and internal quotation marks omitted). We will reverse a conviction "only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991).

> Section 2251(a) punishes:
>
> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . .

The "visual depiction" at issue was a single nude photograph taken by Head of HH. Daniels argues that the image was not "child pornography," and that Head, not Daniels, took the picture.[2]

Daniels's challenge to the manufacturing count fails. First, sufficient evidence was presented to allow a rational jury to conclude that the image was pornographic. Child pornography is defined in § 2251(a) as any "visual depiction" of a minor engaged in "sexually explicit conduct." Sexually explicit conduct is, in turn, defined as the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v). This court considers six factors to be relevant in determining whether a depiction is "lascivious," although this list is "neither comprehensive nor necessarily applicable in every situation." *United States v. Brown*, 579 F.3d 672, 680 (6th Cir. 2009) (internal quotation marks and citations omitted). They are:

1)    whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2)    whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3)    whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4)    whether the child is fully or partially clothed, or nude;

---

[2]Daniels also argues that the jury was not shown the image. But the trial transcript indicates that the image was projected on a screen and provided to the jury during deliberations.

5)      whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6)      whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Ibid.* (quoting *United States v. Dost*, 636 F. Supp. 828, 832 (S.D.Cal. 1986)).

In the image in question, HH is depicted nude, on a bed, seated on her knees, with her buttocks turned toward the camera. Her head is cut out of the frame. Daniels contends that the image was so small and of such "poor quality" that it could not—as a matter of law—be "lascivious." But size and image quality are not factors the jury was required to consider in determining whether the photo depicted a minor engaged in sexually explicit conduct. There is no dispute that HH was nude and that her genitalia were shown. The pose and setting were sexually suggestive, and the fact that the image was taken for an escort ad indicates that it was designed to elicit a sexual response in the viewer. A rational jury could have found that the above factors were satisfied, and that the image was therefore pornographic.

Daniels also contends that he could not be convicted of violating § 2251(a) because Head took the photograph. This argument too fails. Daniels can be held directly liable for the violation under the language of the statute. HH testified that Daniels picked her up, explained the escorting business to her, and took her into a bathroom and asked her to perform oral sex on him. Daniels and Head explained to HH that Head would take pictures of her to advertise on the Internet. A rational jury could have found that, even if Daniels did not actually take the picture of HH, he "persuade[d], induce[d], or coerce[d]" her to engage in "sexually explicit conduct for the purpose of producing [a] visual depiction of such conduct," in violation of 18 U.S.C. § 2251(a). We therefore affirm Daniels's conviction on Count II.**3**

---

**3**Alternatively, Daniels can be held liable under an aiding and abetting theory. An individual may be convicted as a principal responsible for a crime if the person willfully caused the crime to be committed. 18 U.S.C. § 2. Head testified that she worked under Daniels's direction and was subject to discipline by him, and that Daniels asked her to take the pictures of HH. This was sufficient evidence to allow a rational jury to find that Daniels aided and abetted Head in creating the image.

B.  Distributing Child Pornography (Count III)

Section 2252A(a)(2)(A) punishes the knowing receipt or distribution of "any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer." Daniels argues that (1) the image of HH was not distributed *after* it traveled in interstate commerce, and (2) the government presented insufficient evidence that Daniels, rather than Head, distributed the image by uploading it to the Internet.

As to the interstate commerce element of § 2252A(a)(2)(A), the parties stipulated that the image traveled in interstate commerce when it was uploaded to craigslist. The statute requires, however, that the image distributed "*has been . . .* transported" in interstate commerce. Daniels argues that the government failed to establish that the image was distributed *after* it traveled in interstate commerce, as the statute's use of the past tense seems to require. Assuming that Daniels is correct as to the temporal requirement of the statute, we believe the government presented sufficient evidence to establish that the image traveled in interstate commerce before it was distributed. The process by which ads are posted on craigslist was explained to the jury. The image was first uploaded to craigslist.com—thus traveling in interstate commerce, as stipulated by the parties. After the content of the advertisement was uploaded, the person posting the ad verified, by responding to an email, that the image was to be displayed to the public—which constitutes a "distribution."

The government also presented sufficient evidence to allow a rational jury to conclude that Daniels was responsible for the distribution of the image. Even if Head actually uploaded the image and posted the ad, she testified that she posted advertisements because Daniels "told [her] to do it." Thus, the jury could have found that the image was uploaded at Daniels's direction, making him guilty of its distribution. *See* 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

C.  Transporting a Minor with Intent to Engage in Criminal
Sexual Activity (Count IV)

We review Daniels's claim that the district court incorrectly instructed the jury as to Count IV, transporting a minor for purposes of prostitution, in violation of 18 U.S.C. § 2423(a), for plain error, because Daniels did not object to the jury instructions during the trial.  *See United States v. Damra*, 621 F.3d 474, 498 (6th Cir. 2010).  "An instruction is not plainly erroneous unless there was an egregious error, one that directly leads to a miscarriage of justice." *United States v. Yang*, 281 F.3d 534, 551 (6th Cir. 2002).  The error must be "plain under current law," meaning "the law as it exists at the time of [appellate] review," not as it existed at the time the instructions were issued.  *United States v. Cosgrove*, 637 F.3d 646, 656–57 (6th Cir. 2011) (internal quotation marks and citations omitted).  An error may thus be plain on appellate review even if the district court's mistake was understandable given the state of the law at the time. *Ibid.* "It is clear that omitting instructions that are . . . [related] to elements that go to the question of guilt or innocence is plain error." *Damra*, 621 F.3d at 498 (quoting *Glenn v. Dallman*, 686 F.2d 418, 421 n.2 (6th Cir.1982)).

Daniels argues that the district court committed plain error by instructing the jury that the government was not required to prove knowledge of the minor's age to sustain a conviction.  The district court instructed the jury that "[t]he law places the risk of . . . mistake or ignorance on the defendant."  Daniels transported SD from College Park, Maryland, to Detroit, Michigan, but she revealed her age only after she had traveled to Detroit and engaged in prostitution.  Thus, the government did not prove that Daniels knew she was 16 at the time.

Section 2423(a) provides:

> A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

Other circuits addressing this question have held that knowledge of the victim's age is not a required element of the statute. *See, e.g.*, *United States v. Cox*, 577 F.3d 833, 838 (7th Cir. 2009); *United States v. Jones*, 471 F.3d 535, 539 (4th Cir. 2006); *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002); *United States v. Taylor*, 239 F.3d 994, 997 (9th Cir. 2001).

Daniels argues, however, that the Supreme Court's holding in *Flores-Figueroa v. United States*, 129 S. Ct. 1886 (2009), compels a different result. The Court held that "knowingly" applies to each element in the similarly worded aggravated-identity-theft statute, 18 U.S.C. § 1028A(a)(1), which punishes a person who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." The Court reasoned that, "[a]s a matter of ordinary English grammar, it seems natural to read the statute's word 'knowingly' as applying to all the subsequently listed elements of the crime." *Id.* at 1890. Thus, in the case of an undocumented immigrant who used counterfeit Social Security and alien-registration numbers, "knowingly" applied to the fact that the numbers used belonged to an actual person. *Id.* at 1894.

Following *Flores-Figueroa*'s logic, the most natural reading of § 2423(a) would apply "knowingly" to each element of the statute—including, in this case, the fact that the person transported "has not attained the age of 18." But our analysis does not end there. The Court's majority acknowledged that "the inquiry into a sentence's meaning is a contextual one," and that the identity-theft statute presented "[n]o special context." *Id.* at 1891. The history of the aggravated-identity-theft statute was inconclusive as to "whether Congress intended to achieve . . . enhanced protection [of potential victims] by permitting conviction of those who do not *know* the ID they unlawfully use refers to a real person." *Id.* at 1892. The Court thus left open the possibility that, in other circumstances, congressional purpose or "practical problems of enforcement" *might* "overcome the ordinary meaning" of a statute. *Id.* at 1894. Indeed, Justice Alito, cautioning against an "inflexible rule of construction," cited § 2423(a)—the very statute at issue here—as an example of when "context may well rebut [the] presumption" that

a mens rea requirement applies to every element of an offense.  *Id*. at 1895–96 (Alito, J., concurring).

After *Flores-Figueroa*, the Seventh Circuit held that the context of § 2423(a) compels a reading of the statute that does *not* require "knowingly" to be applied to the victim's age.  That reading, it reasoned, "is consistent with congressional intent that minors need special protection against sexual exploitation."  *Cox*, 577 F.3d at 837.  We agree that this context justifies requiring a defendant—who would presumably know he is treading close to the line in transporting a young person to engage in illicit sexual activity—to bear the risk that the person transported is underage.

The Seventh and other circuits have also noted that, under the Mann Act, 18 U.S.C. § 2421, a defendant commits a crime any time he transports an individual for the purpose of prostitution.  Therefore, "age in § 2423(a) is not a factor that distinguishes criminal behavior from innocent conduct," but rather serves to justify a harsher penalty when a victim is underage.  *Ibid*; *see also Taylor*, 239 F.3d at 997 ("As Congress intended, the age of the victim simply subjects the defendant to a more severe penalty in light of Congress' concern about the sexual exploitation of minors.").  In contrast to the aggravated-identity-theft statute, when a defendant violates the Mann Act, he knows a *real* victim is involved, even if he does not know that victim is a minor.

In sum, we conclude that *Flores-Figueroa* does not compel a particular interpretation of § 2423(a).  Rather, the resolution of this issue depends on the relative weight given to text and context.  We think context matters.  Here, the context of § 2423(a) dictates that the government did not need to prove that Daniels *knew* SD was a minor, and we affirm his conviction on Count IV.

### D.  Sex Trafficking of Children (Count V)

Daniels challenges his conviction for sex trafficking of children, in violation of 18 U.S.C. § 1591(a), claiming that the government failed to prove beyond a reasonable doubt that he knew the alleged victims were minors.  Section 1591(a) punishes a person who:

> knowingly [] in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, or obtains by any means a person . . . *knowing that* . . . the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]

(emphasis added). Unlike § 2423(a), the statute requires the government to prove knowledge of age.

Daniels argues that he tried to avoid associating with minors, and that the underage prostitutes lied about their ages. The government, however, presented direct evidence that Daniels knew that some of the girls were under 18 when they worked as prostitutes. HH, ReH, and RaH all testified that they told either Daniels or Head that they were underage. Head also testified that Daniels thought that the sisters were 17—older than their true ages, but underage nonetheless. A notebook introduced as evidence listed the ages of HH and ReH as "17." Viewing this evidence in the light most favorable to the prosecution, as we must, we believe a rational juror could have credited the witnesses' testimony and concluded that the government proved the age element. We therefore affirm Daniels's conviction on Count V.

### E. Child Exploitation Enterprise (Count I)

On July 27, 2006, the President signed H.R. 4472, the "Adam Walsh Child Protection and Safety Act of 2006" (Pub. L. No. 109-248), which enhanced punishments for the sexual trafficking of minors. The act created a new crime of engaging in a CEE, which carries a mandatory minimum of twenty years in prison. The CEE statute provides:

> A person engages in a child exploitation enterprise for the purposes of this section if the person violates section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim), as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons.

18 U.S.C. § 2252A(g). The statute thus requires that the government prove: (1) the defendant committed at least three separate predicate offenses that constitute a series of

at least three incidents; (2) more than one underage victim was involved; and (3) at least three other people acted "in concert" with the defendant to commit the predicate offenses.

The federal courts have had little opportunity to consider the elements required for a conviction under § 2252A(g).[4]  Similar language appears, however, in 21 U.S.C. § 848, the provision of the Drug Abuse Prevention and Control Act that punishes participation in a "continuing criminal enterprise" ("CCE").  That statute states that

> "[a] person is engaged in a continuing criminal enterprise if--
>
> (1)  he violates any provision of [the Drug Abuse Prevention and Control Act] the punishment for which is a felony, and
>
> (2)  such violation is a part of a continuing series of violations of [the Act]--
>
>      (A)  which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
>      (B)  from which such person obtains substantial income or resources.

*Id*. § 848(c).  Given the similar language—"series of . . . violations" and "in concert with . . . other persons"—we believe that interpretations of § 848 should guide our interpretation of § 2252A(g).

The first element of the CEE—a series of three separate predicate offenses—is easily established in this case.  In *Richardson v. United States*, 526 U.S. 813 (1999), the

---

[4] The Eleventh Circuit addressed whether the statute was unconstitutionally vague. *United States v. Wayerski*, 624 F.3d 1342, 1348 (11th Cir. 2010).  Its discussion of the required elements adds little to the statute's text:

> We agree with the Government that a person of ordinary intelligence would, under a fair reading of the statute, understand that an offense is committed when (1) he commits any of several enumerated predicate offenses, (2) the predicate offenses comprise a series of three felony violations on three or more separate instances, (3) the offense involves more than one victim, and (4) he commits the predicate offenses in concert with three or more other persons. *Ibid.*

Supreme Court held that a conviction under § 848 requires a jury to agree on which crimes committed by the defendant made up the required series of violations. *Id*. at 824. Following *Richardson*, the jury must have unanimously found that Daniels committed three specific predicate offenses.  In this case, Counts II–V are predicate felony violations for the purposes of § 2252A(g).  The jury found that Daniels committed each of these offenses, and—as discussed above—Daniels's challenge to those convictions fails.  The four counts involved at least three separate incidents that were all related to Daniels's prostitution business and may thus be considered a "series."

The second element of the CEE is also established, because the government presented evidence that more than one minor victim was involved in the series of violations.  SD, HH, ReH, and RaH were all victims of the charged counts.  The *Richardson* Court explained that, other than the predicate offenses, the statutory requirements of § 848(c) need not "be satisfied with respect to *each* underlying crime," but may instead "be met with respect to the *series*, which, at a minimum, permits the jury to look at all of the agreed-on violations in combination."  *Id.* at 823.[5]  We apply this interpretation to  § 2252A(g) and hold that, when the predicate counts are considered in combination, the jury could easily have found that more than one victim was involved.

The final element of the CEE requires that the defendant have committed "those offenses in concert with three or more other persons."  Although Daniels proposes an interpretation that would require *each* predicate offense to have been committed "in concert with three or more other persons," we read "those offenses" to refer to the "*series* of felony violations."  We conclude that the required total of three other persons may be tallied by considering the predicate counts together.[6]  The government therefore needed to present sufficient evidence that a total of at least three other persons acted in concert with Daniels to commit one or more of the counts.

---

[5]The Court assumed without deciding that there was no unanimity requirement as to the other required elements. *Id*. at 824.

[6]This interpretation is consistent with *Richardson*, although given the somewhat different wording of § 848(c), that case does not dictate our conclusion.

To determine whether the government met its burden, we must decide what it means to act "in concert" for purposes of § 2252A(g). The Eleventh Circuit held in *Wayerski* that conspiracy is a lesser-included offense of a CEE charge, because the latter "requires . . . proof of an agreement that would also violate [sic] [a] conspiracy offense." 624 F.3d at 1350–51. The Eleventh Circuit based this conclusion on the Supreme Court's holding that the use of the same "in concert" language in § 848 meant that conspiracy, under 21 U.S.C. § 846,[7] is a lesser included offense of § 848. *See Rutledge v. United States*, 517 U.S. 292, 300 (1996). The Court explained that "because the plain meaning of the phrase 'in concert' signifies mutual agreement in a common plan or enterprise, . . . this element of the CCE offense requires proof of a conspiracy that would also violate § 846." *Ibid*.

It is clear to us that, in order for someone to have acted "in concert" with Daniels to commit one of the predicate felonies, he or she must have had the mens rea required to "conspire" with him to commit that offense. "Although this court has long held that the essence of conspiracy is agreement, . . . 'a tacit or material understanding among the parties' will suffice." *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). Still, some type of "agreement must be shown beyond a reasonable doubt." *Id*. at 971. Daniels concedes that Head acted in concert with him to commit all of the charged counts. Thus, his conviction of Count I will stand if the government presented evidence that two other persons conspired with him on any of the counts. We examine each count to determine if any co-conspirators participated in the offenses.

Counts II and III, manufacturing and distributing child pornography, involved no participants other than Daniels, Head, and HH. As the victim, HH cannot be deemed a co-conspirator. When a crime inherently requires "two to tango," but the statute is not intended to punish the victim of the crime—as is the case in prostitution or the

---

[7]Section 846 states:

Any person who attempts or conspires to commit any offense defined in [the Controlled Substances Act] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

manufacture of pornography—federal courts regularly apply a common-law exception to conspiratorial or accomplice liability. *See generally* Model Penal Code § 2.06(6) (stating that "a person is not an accomplice in an offense" if "he is a victim" or "the offense is so defined that his conduct is inevitably incident to its commission"); *Gebardi v. United States*, 287 U.S. 112 (1932) (woman who acquiesced to being transported interstate could not be guilty of conspiracy to violate the Mann Act). That exception applies here.

Count IV, transporting a minor for purposes of prostitution, was based on the transportation of SD from Maryland to Detroit. In addition to Daniels, Head, and SD herself, one other person was along for this ride: an adult prostitute named "Trouble." The government presented evidence that Trouble spoke with SD about her work, went with SD to purchase items at a sex shop and mall, and rode back to Detroit with SD, Head, and Daniels. This was sufficient to allow the jury to infer that Trouble conspired with Head and Daniels to transport SD across state lines. Although no evidence was presented that Trouble knew that SD was a minor, we have just clarified that § 2423(a) does not require knowledge of the victim's age. Thus, with Head and Trouble, the total of "other persons" now stands at two.

Count V, sex trafficking of children, required proof that the perpetrator knew the victims—RaH, ReH, HH, and KC—were underage. The government presented no evidence that anyone but Head and Daniels knew this was the case. Prostitute Brittany Ayers testified that she did not know, until she was arrested by police while on a "date" with KC, that KC was underage. Although the government argues that Daniels's mother, brother, several adult prostitutes who worked for Daniels, and Daniels's "fellow pimps" all aided Daniels's prostitution enterprise, it presented no evidence that *any* of these people knew Daniels was sex trafficking minors. The tally of "other persons" thus remains at two.

We conclude that the government failed to present evidence that "three or more other persons" acted "in concert" with Daniels to commit the series of predicate felonies. Daniels's conviction on Count I is reversed.

F.  Retroactive Misjoinder

Daniels argues that because Count I, the CEE charge, was used to introduce prejudicial evidence that was not otherwise admissible—such as the jewelry, furs, and "pimp chalice"—he is entitled to a new trial on the remaining counts.  According to Daniels, the most damning evidence introduced was the testimony that Daniels and Head posted thousands of escort ads on craigslist and Head's recorded conversation telling another prostitute that Daniels was "pimping . . . little kids."  He also claims that the government unfairly "stereotyped" him as a "pimp."  The resulting prejudice, he argues, deprived him of a fair trial on Counts II–V.

"Retroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments—such as . . . an appellate court's reversal of less than all convictions—render the initial joinder improper."  *United States v. Jones,* 482 F.3d 60, 78 (2d Cir. 2006) (internal quotation marks and citation omitted).  To succeed on a retroactive misjoinder claim, in which a defendant alleges that the prejudicial "spillover" of otherwise inadmissible evidence influenced the jury's decision on the remaining counts, the defendant must show either "compelling prejudice" or that the prosecutor acted in "bad faith" in bringing the charge.  *United States v. Deitz*, 577 F.3d 672, 693 (6th Cir. 2009).

Here, there was no bad faith:  the prosecutor had "a reasonable expectation of obtaining a valid conviction," *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975), and did in fact obtain a conviction on Count I.  That the conviction is now reversed based on our first-impression interpretation of the CEE statute does not imply that it was brought in bad faith.

Nor can Daniels demonstrate "compelling prejudice."  Some of the evidence submitted in support of Count I—such as the fact that Daniels referred to himself as a "pimp"—was clearly relevant to other counts of the indictment, as it demonstrated knowledge and intent on Daniels's part with respect to the sex-trafficking and adult-prostitution counts.  Although evidence of uncharged crimes was introduced, the government did not introduce evidence of activities in which Daniels himself did not

participate, which is sometimes the case when a conspiracy count is joined to an individual offense.  *See, e.g.*, *United States v. Tellier*, 83 F.3d 578, 581–82 (2d Cir. 1996) (reversal of a single robbery conviction warranted where evidence presented on RICO count described fifteen major robberies and four murders committed by co-conspirators).

More importantly, the government presented more than adequate, direct evidence to sustain Daniels's conviction on the remaining counts.  The jury did not rely on weak inferences.  The underage prostitutes testified that they told Head or Daniels they were minors, and the evidence regarding the interstate transportation of SD was overwhelming.  And finally, the evidence supporting Count I was not substantially more inflammatory than the other evidence presented, such as the underage witnesses' testimony that Daniels approached them on the street in his Cadillac, took them to a hotel room, and had them undress or perform oral sex on him.  We do not believe the "spillover" evidence would have "tended to incite or arouse the jury into convicting the defendant on the remaining counts."  *Jones*, 482 F.3d at 78.

### III

We AFFIRM Daniels's conviction on Counts II–V, but REVERSE his conviction on Count I.